*This opinion is subject to revision before publication.*

# UNITED STATES COURT OF APPEALS
## FOR THE ARMED FORCES

————————

## UNITED STATES
Appellee

**v.**

## Caleb A. C. SMITH, Airman
United States Air Force, Appellant

**No. 22-0237**
Crim. App. No. 40013

Argued January 25, 2023—Decided July 12, 2023

Military Judge: Bryan D. Watson

For Appellant: *Scott R. Hockenberry,* Esq. (argued); *Major Heather M. Caine, Major Megan E. Hoffman,* and *Brian Pristera,* Esq. (on brief).

For Appellee: *Captain Jocelyn Q. Wright* (argued); *Colonel Naomi P. Dennis, Lieutenant Colonel Matthew J. Neil,* and *Mary Ellen Payne,* Esq. (on brief).

Judge JOHNSON delivered the opinion of the Court, in which Chief Judge OHLSON, Judge SPARKS, Judge MAGGS, and Judge HARDY joined.

————————

Judge JOHNSON delivered the opinion of the Court.

A panel of officer members convicted Airman (Amn) Caleb A. C. Smith, contrary to his pleas, of one specification of sexual assault by oral penetration against Senior Airman (SrA) HS, in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920 (2018). The panel acquitted Appellant of another specification alleging a sexual assault by digital penetration, in violation of Article 120, UCMJ. The approved sentence consisted of a dishonorable discharge, confinement for sixty days, forfeiture of all pay and allowances, and reduction to E-1. The United States Air Force Court of Criminal Appeals (AFCCA) affirmed the findings and the sentence, *United States v. Smith,* No. ACM 40013, 2022 CCA LEXIS 308, at *2, 2022 WL 1667257, at *1 (A.F. Ct. Crim. App. May 25, 2022) (unpublished), and Appellant filed a timely appeal with this Court.

We granted review in this case to determine two issues:

> I. Whether the military judge erred in admitting text messages and testimony as an excited utterance related to the alleged victim's belief that she was raped where she had no memory of the events in question; and

> II. Whether the evidence was legally insufficient because the alleged victim was capable of consenting and where, even if she was not capable of consenting, Appellant reasonably believed that she did consent.

*United States v. Smith*, 83 M.J. 76, 76 (C.A.A.F. 2022) (order granting review).

For the reasons stated below, we hold that the military judge did not abuse his discretion by admitting the victim's electronic messages as an excited utterance and did not plainly err in admitting her testimony about the messages. As to the second issue, we find that the evidence for Appellant's conviction was legally sufficient because the Government introduced ample evidence for a rational trier of fact to find beyond a reasonable doubt that Appellant committed a sexual act upon SrA HS when she was incapable of

consenting due to impairment by intoxication, and Appellant knew or reasonably should have known of the impairment. Accordingly, we affirm the decision of the AFCCA.

## I. Background

Appellant and SrA HS became friends in the summer of 2018, when both were assigned to bay orderly duties at Fort Gordon, Georgia. At the time, SrA HS was in a long-distance relationship with a Marine. Although she and Appellant socialized regularly, they did not have a romantic relationship.

On November 16, 2018, Appellant and SrA HS drove from Fort Gordon to Charlotte, North Carolina, to attend a concert. They planned to spend the night in Charlotte and reserved a single hotel room with two beds to save money. When they arrived in Charlotte at around 6:30 p.m., they went directly to the concert venue, where they ordered alcoholic drinks and watched the opening band. They took turns waiting in the long line to buy additional rounds of drinks.

At approximately 9:00 p.m., after the opening band performed, Appellant and SrA HS went to talk with the opening band and look at their merchandise. SrA HS testified that "[t]hings sort of start[ed] getting hazy around that point"; she was "pretty drunk" and dizzy, had consumed at least three "very strong" drinks, and had not eaten anything since she arrived at the concert venue. The last thing she remembered from the concert was talking with the opening band. The next thing she remembered was falling onto a bed at the hotel. She chose the bed nearest to the door and went to sleep fully clothed.

SrA HS awoke the next morning in the other bed with Appellant, with his arm draped around her. She was naked. She had no memory of how her clothes were removed. The AFCCA described her testimony:

> HS said that she "froze. [She] was freaking out. [She] just kind of panicked." She then "got up and went to the bathroom very quickly." She felt "[n]auseated, panicky . . . [and] was shaking." In

the bathroom, she noticed that her vaginal area was sore and bleeding, but "just shrugged [this feeling] off." As she got dressed, she noticed that her underwear was missing. She eventually found them shoved underneath the covers of the opposite bed from the one in which she woke up, the bed she originally planned to sleep in. When she found them, her underwear "were completely ripped through on one side, at the hip."

*Smith,* 2022 CCA LEXIS 308, at \*5, 2022 WL 1667257, at \*2 (alterations in original).

Appellant and SrA HS had taken a taxi from the concert venue to the hotel because they both were too intoxicated to drive, so in the morning she took an Uber to retrieve her car. She found it parked across the street from the concert venue, and then she drove back to the hotel to change her clothes and check out. SrA HS and Appellant had breakfast and stopped at a cafe before starting their drive back to Fort Gordon. She asked him why her underwear was torn. He said he did not know.

On their way out of town, Appellant and SrA HS stopped at a gas station, where she used the restroom. While looking in the mirror, she noticed a hickey or bruise on her neck and another on her collarbone. Upon further investigation, she discovered bruises on her chest and arms. She testified, "I sort of freaked out. . . . I panicked. I didn't cry, but I felt nauseated and started shaking again. And I messaged my friend [Amn MH], and I told him that I thought that [Appellant] had raped me." She explained:

> I was sort of putting together everything I noticed at the hotel room, and I just sort of came to the realization that I shouldn't have brushed everything off at the hotel room, because initially I thought that it was impossible, but I just felt like it was obvious proof and I couldn't really deny it anymore at that point.

As she sent the message, she experienced "[h]ands shaking, nausea, [and] sweating." By the time she exited the bathroom several minutes later, she "had calmed down enough"

that her hands were no longer shaking and she was not sweating.

SrA HS returned to the car, and she and Appellant drove back to Fort Gordon. She testified that the ride home was awkward. In response to her queries, he told her security guards had asked them to leave the concert when they found her sitting on the floor, too drunk to stand, and the taxi driver had to help Appellant carry her into the hotel. She asked Appellant why they were in bed together. He told her she had urinated on the other bed.

Back at Fort Gordon, SrA HS dropped Appellant off at his barracks, and then, on the advice of a friend, went to the emergency room and obtained a Sexual Assault Forensic Exam (SAFE). She initially made a restricted report of sexual assault, but unrestricted it several months later.

Appellant was interviewed by Air Force Office of Special Investigations (AFOSI) agents on two occasions, in March and April 2019. In the first interview, he agreed to provide DNA samples for comparison with SrA HS's SAFE evidence. He initially claimed he could not remember much of the evening, but he then admitted that was untrue and acknowledged having sexual contact with SrA HS. Over the course of the two interviews, both of which were videotaped and played for the members, he disclosed details about her intoxicated state and their interactions.

Appellant told AFOSI that security guards kicked them out of the concert because SrA HS was so intoxicated she could not stand up, and they had to take a taxi to the hotel because they were both too drunk to drive. He had consumed four or five double shots. He did not know how much SrA HS drank, but he thought she probably had as many drinks as he had. She was "literally falling over" and slurring her speech by the time they were asked to leave. Appellant had to help her unlock her phone to find the address for their hotel. He had never seen her so intoxicated. On the ride to the hotel, she seemed "drunk" and "wobbly." He told AFOSI that the taxi driver had to help them into the hotel.

Once inside the hotel room, according to Appellant, SrA HS urinated on both beds and stumbled around the room mumbling. He said that she stripped down to her underwear and helped him remove her bra because he was having difficulty getting it off. Despite initially denying knowledge of how her underwear was torn, he eventually admitted he ripped it off her. And despite initially denying any memory of sexual contact, he eventually told AFOSI, "We didn't have sex, but we made out." He told AFOSI that he performed oral sex on SrA HS, "and then I decided when she was rubbing up on me, I decided that it was a wrong idea to have sex with her since she was drunk, and I was scared that I would get in trouble for it." He insisted she was "grinding on [him]," and when he stopped her, she was "pissed" and "mopey" and said she "want[ed] to keep going."

In his second interview, Appellant said that SrA HS was kissing him, biting his lip, and rubbing his penis while they were "making out." He said that she urinated on the second bed while they were so engaged. He disengaged after a "sober moment[]," when he thought, "We were too drunk, and she has a boyfriend . . . ." In his written statement, Appellant apologized for not being truthful with AFOSI initially, explaining that he was afraid he would get in trouble.

At trial, portions of the Snapchat messages between SrA HS and Amn MH were admitted into evidence, as were Appellant's written and videotaped statements. The Government also introduced expert testimony from a forensic biologist who testified that Appellant's DNA was found on swabs taken of SrA HS's pubic mound and the inside crotch of her underwear and opined that this evidence was consistent with Appellant performing oral sex on her.

## II. Discussion

### A. Excited Utterance

The military judge admitted, over defense objection, a screenshot of SrA HS's Snapchat message to Amn MH that said, "I think he raped me." Before making this evidentiary ruling, the military judge required the Government to

present evidence so that he could determine whether the message was an exited utterance under Military Rule of Evidence (M.R.E.) 803. The Government called SrA HS, who testified in an Article 39(a), UCMJ, 10 U.S.C. § 839(a) (2018), session about the circumstances under which the message was sent. Following her testimony, the military judge stated: "I do believe that the Government has laid the appropriate foundation for an exited utterance exception to the hearsay rule." The military judge did not place further analysis on the record. The AFCCA found that the military judge did not abuse his discretion in admitting the Snapchat message as an excited utterance, and therefore, he did not plainly err in admitting SrA HS's testimony describing the message. *Smith*, 2022 CCA LEXIS 308, at \*29-30, 2022 WL 1667257 at \*11. For the reasons provided below, we affirm the decision of the AFCCA.

1. *Applicable Law*

This Court reviews "a 'military judge's ruling admitting or excluding an excited utterance [for] an abuse of discretion.'" *United States v. Henry*, 81 M.J. 91, 95 (C.A.A.F. 2021) (alteration in original) (quoting *United States v. Feltham*, 58 M.J. 470, 474-75 (C.A.A.F. 2003)). "An abuse of discretion occurs when a military judge either erroneously applies the law or clearly errs in making his or her findings of fact." *United States v. Donaldson*, 58 M.J. 477, 482 (C.A.A.F. 2003). "[T]he abuse of discretion standard of review recognizes that a judge has a range of choices and will not be reversed so long as the decision remains within that range." *United States v. Gore*, 60 M.J. 178, 187 (C.A.A.F. 2004) (citation omitted). "[W]here the military judge places on the record his analysis and application of the law to the facts, deference is clearly warranted. On the contrary, [i]f a military judge fails to place his findings and analysis on the record, less deference will be accorded." *United States v. Finch*, 79 M.J. 389, 397 (C.A.A.F. 2020) (second alteration in the original) (internal quotation marks omitted) (citations omitted).

"When reviewing a decision of a Court of Criminal Appeals on a military judge's discretionary ruling, 'we

typically have pierced through that intermediate level' and examined the military judge's ruling." *Feltham*, 58 M.J. at 474-75 (quoting *United States v. Siroky,* 44 M.J. 394, 399 (C.A.A.F. 1996)). "We then decide whether the Court of Criminal Appeals was correct in its examination of the military judge's ruling." *Id.* at 475.

Unpreserved evidentiary errors are forfeited in the absence of plain error. *United States v. Knapp*, 73 M.J. 33, 36 (C.A.A.F. 2014). Under this standard, the appellant bears the "burden of establishing (1) error that is (2) clear or obvious and (3) results in material prejudice to his substantial rights." *Id.* (citing *United States v. Brooks*, 64 M.J. 325, 328 (C.A.A.F. 2007)).

"As a general rule, hearsay, defined as an out of court statement offered into evidence to prove the truth of the matter asserted, is not admissible in courts-martial." *United States v. Ayala*, 81 M.J. 25, 28 (C.A.A.F. 2021) (citing M.R.E. 801(c) and M.R.E. 802). However, "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused," is admissible as an exception to the general prohibition on hearsay as an excited utterance. M.R.E. 803(2). "The implicit premise [of the exception] is that a person who reacts to a startling event or condition while under the stress of excitement caused thereby will speak truthfully because of a lack of opportunity to fabricate." *United States v. Jones*, 30 M.J. 127, 129 (C.M.A. 1990) (internal quotation marks omitted); *see also White v. Illinois*, 502 U.S. 346, 357 (1992) (explaining that "a statement that qualifies for admission under a 'firmly rooted' hearsay exception is so trustworthy that adversarial testing can be expected to add little to its reliability" (quoting *Idaho v. Wright,* 497 U.S. 805, 820-21 (1990))).

For hearsay to be admitted as an excited utterance: (1) "the statement must be spontaneous, excited or impulsive rather than the product of reflection and deliberation"; (2) "the event [that prompts the utterance] must be startling"; and (3) "the declarant must be under the stress of excitement caused by the event." *United States v. Arnold*, 25 M.J.

129, 132 (C.M.A. 1987) (internal quotation marks omitted) (citations omitted). "The proponent of the excited utterance has the burden to show by a preponderance of the evidence that each element is met." *Henry*, 81 M.J. at 96.

### 2. *Additional Background*

SrA HS testified on direct examination that when she was in the bathroom and saw bruises on her chest and arms, she panicked and messaged her friend via Snapchat that she thought she had been raped by Appellant. She explained that in that moment, she pieced together everything she had observed at the hotel and realized that she should not have brushed off those observations. The defense did not object to this testimony.[1]

The Government then handed SrA HS a screenshot of the Snapchat message that included the following exchange:

| [SrA HS:] | I think he raped me. |
| --- | --- |
| [Amn MH:] | Wait what |
| | What happened? |
| | Are you okay? |
| [SrA HS:] | No |
| | I noticed a hickey on my neck and then saw handprints on my boobs. |

When the Government asked SrA HS where she was when she sent the message, the defense objected on the basis of

---

[1] Although the granted issue asks whether the military judge erred in admitting text messages and testimony regarding the victim's belief that she was raped, the briefs to this Court focus on the admissibility of one line of a Snapchat message from SrA HS to Amn MH: "I think he raped me." The defense did not object to SrA HS's testimony that she sent the message, and the briefs do not provide any distinct argument for the inadmissibility of the testimony apart from the admissibility of the message itself. Accordingly, we review the admission of the testimony for plain error, in light of our resolution of the admissibility of the message.

hearsay, arguing that the Snapchat message did not meet the foundational elements of an excited utterance because SrA HS was "texting him. She[ was] not still looking at a startling event or condition" at the time she sent the message.[2]

The Government countered that a proper foundation was established where the message was "sent while she's still in the bathroom under the stress of the idea of having now just seen all these bruises and piecing together that she believed that she had been sexually assaulted."[3]

The military judge convened an Article 39(a), UCMJ, session to hear evidence and arguments on the hearsay objection to the Snapchat message. In the Article 39(a), UCMJ, session, SrA HS elaborated on her prior testimony that she freaked out and panicked when she saw the bruises, testifying that her hands were shaking and she was sweating and nauseated as she messaged Amn MH from the gas station bathroom, where she discovered the bruises. She was in the bathroom for approximately three minutes.

After hearing testimony and arguments, the military judge overruled the objection, concluding that the Government laid an appropriate foundation for admission under the excited utterance exception to the general prohibition

---

[2] The defense also objected on grounds of relevance and cumulativeness and objected to the witness reading from an exhibit that had not yet been admitted. The military judge overruled objections on the first two grounds and sustained the objection on the latter. The military judge's rulings on these objections are not at issue on this appeal.

[3] In addition to arguing that the "I think he raped me" message was an excited utterance under M.R.E. 803(2), the Government also argued that a number of the messages were admissible "as descriptions of then-existing physical state and of moments where she is making plans" under M.R.E. 803(3). The military judge admitted portions of the Snapchat thread under M.R.E. 803(3), but did not decide whether the statement, "I think he raped me," was admissible under this rule, having already found it admissible as an excited utterance.

against hearsay. Before concluding the Article 39(a), UCMJ, session, the military judge granted the defense's request to restate the objection for the record, in which the defense focused on the first and third prongs of the excited utterance test. As to the first prong, the defense argued that the statement "I think he raped me" was the product of reflection and deliberation, and not spontaneous, excited, or impulsive, because "she is taking a series of observations, she's adding them together, and then she's drawing a conclusion as to an event that she did not observe, the 'I was raped.'" As to the third prong, the defense argued that, although seeing the bruises may have been startling, her statement was not about the bruises; her statement was about being raped, but because she did not have any memory of being raped, she was "not under the stress or excitement of the event for which she has no memory."

The AFCCA affirmed the ruling, finding sufficient evidence to support the military judge's conclusion that SrA HS's Snapchat message was an excited utterance: SrA HS first noticed the bruises while she was in the gas station bathroom; noticing the bruises caused her to think about what had happened the previous night; and putting together the bruising, her observations of blood and her torn underwear caused her to start shaking, sweating, and become nauseated. *Smith,* 2022 CCA LEXIS 308, at \*28, 2022 WL 1667257, at \*10. "It was while she was feeling those things, and experiencing those physical manifestations, that she contemporaneously sent a message to her friend that she thought she was raped." *Id.*, 2022 WL 1667257, at \*10.

Applying the three-prong test for an excited utterance, the AFCCA determined that:

> the military judge could conclude that the cause of HS's stress was not thinking about the previous night in a pensive manner, or that the statements were made after reflection and deliberation. Instead, the evidence shows that seeing hickeys and bruises—and having no explanation for them—as well as putting all the pieces together in her mind—the torn underwear and blood coupled with

bruising—sent HS into distress, and she was un-
der that stress when she sent the messages.

*Id.* at \*29, 2022 WL 1667257, at \*10. Based on that analy-
sis, the AFCCA concluded that SrA HS need not have had
any memory of the actual sexual encounter for the excited
utterance exception to apply. *Id.* at \*28-29, 2022 WL
1667257, at \*10-11.

### 3. *Analysis*

In *Arnold*, we identified three elements that must be
satisfied in order to admit hearsay as an excited utterance:
(1) "the statement must be spontaneous, excited or impul-
sive rather than the product of reflection and deliberation";
(2) "the event [that prompts the utterance] must be star-
tling"; and (3) "the declarant must be under the stress of
excitement caused by the event." *Arnold*, 25 M.J. at 132
(internal quotation marks omitted) (citations omitted). Alt-
hough the military judge is entitled to little deference be-
cause his ruling was supported by only bare-boned findings
of fact and analysis on the record, we conclude that he did
not abuse his discretion in admitting SrA HS's Snapchat
message, "I think he raped me," as an excited utterance.

First, the evidence supports the conclusion that the
statement was "spontaneous, excited or impulsive rather
than the product of reflection and deliberation." *Id.* (inter-
nal quotation marks omitted) (citation omitted). The mes-
sage was a spontaneous outburst prompted by SrA HS's
thought, upon looking in the mirror and noticing the
bruises for the first time, that she might have been the vic-
tim of a sexual assault.

The compact time line between SrA HS's discovery of
the bruises and her statement supports the determination
that the statement was spontaneous. As she testified, she
was only in the bathroom for about three minutes. The
statement, "I think he raped me," was the first message she
sent to Amn MH after seeing the bruises for the first time
while in the bathroom. The medium through which she
made the statement and the subsequent questions and an-
swers do not detract from the spontaneous nature of the

statement. *See* M.R.E. 801(a)(2) (defining "statement" for purposes of hearsay rules to include a "written assertion"); *see also United States v. Gortzig*, No. NMCCA 202100064, 2022 CCA LEXIS 515, at *15, 2022 WL 3907762, at *6 (N-M. Ct. Crim. App. Aug. 31, 2022) (per curiam) (unpublished) (holding that the military judge did not abuse discretion in admitting text messages as excited utterance); *United States v. Dias*, No. NMCCA 201500177, 2017 CCA LEXIS 583, at *6-7, 2017 WL 3762141, at *2 (N-M. Ct. Crim. App. Aug. 31, 2017) (per curiam) (unpublished) (same). Therefore, it was within the military judge's discretion to conclude that the message was "spontaneous, excited or impulsive rather than the product of reflection and deliberation." *Arnold*, 25 M.J. at 132 (internal quotation marks omitted) (citation omitted).

Turning to the second prong of the excited utterance test, the record supports the conclusion that SrA HS's discovery of visible bruising was "startling." *Id.* (internal quotation marks omitted) (citation omitted). Having no recollection of how she got these unexplained, extensive injuries, her immediate reaction was to "freak[] out." She explained that this meant that she started shaking and felt nauseated. In the midst of this physical and emotional response, the significance of her morning discoveries of blood and vaginal soreness, which she had brushed off at the time, sprung to her mind. In her distress, she reached out via Snapchat to her friend, essentially blurting out, "I think he raped me." As she sent the message, her hands were shaking, she felt nauseated, and she was sweating.

Appellant's arguments that the statement is not an excited utterance are contingent on concluding that the "startling event or condition" in this case was the sexual encounter between Appellant and SrA HS. Having concluded that the startling event or condition was SrA HS's discovery of the bruising on her body, we reject Appellant's argument that the Snapchat message fails to meet the foundational requirement for an excited utterance because it refers to an alleged rape that the victim does not remember. The plain language of M.R.E. 803(2) provides for admission of "[a]

statement *relating to* a startling event or condition." (Emphasis added.) There is no requirement that the excited utterance directly mention the startling event or condition, or that the startling event or condition must be the underlying offense. The Government cites an unpublished United States Court of Appeals for the Tenth Circuit case for a proposition that goes to the heart of this issue: " '[t]he basis of the excited utterance exception rests with the spontaneity and impulsiveness of the statement; thus, the startling event does not have to be the actual crime itself, but rather may be a related occurrence that causes such a reaction.' " *United States v. Lossiah*, 129 F. App'x 434, 438 (10th Cir. 2005) (unpublished) (alteration in original) (quoting *Esser v. Commonwealth*, 566 S.E.2d 876, 879 (Va. Ct. App. 2002)). We agree and decide that it was within the military judge's discretion to conclude that the statement "I think he raped me," viewed in context, related to the startling event of discovering the bruises and articulated SrA HS's belief that they may have been caused by the alleged sexual assault.

Third, the record supports the conclusion that SrA HS was "under the stress of excitement caused by the event" when she uttered the message. *Arnold*, 25 M.J. at 132 (internal quotation marks omitted) (citation omitted). "Relevant to the third prong of this inquiry are 'the physical and mental condition of the declarant' and 'the lapse of time between the startling event and the statement.' " *Henry*, 81 M.J. at 96 (quoting *Donaldson*, 58 M.J. at 483). As discussed above, SrA HS testified that at the time she sent the message, immediately after the startling event, her hands were shaking, she was nauseated, and she was sweating. It was within the military judge's discretion to conclude that she was "under the stress of excitement caused by the event." *Arnold*, 25 M.J. at 132 (internal quotation marks omitted) (citation omitted).

As the AFCCA noted: "The record supports the conclusion that HS's statement, 'I think he raped me,' was not a statement of fact, but instead a spontaneous belief or opinion, under physical and emotional stress of shaking,

14

sweating, and feeling nausea." *Smith,* 2022 CCA LEXIS 308, at \*28, 2022 WL 1667257, at \*10. A statement of belief or opinion can constitute an excited utterance as long as it is related to the startling event that prompted it. *Woodward v. Williams*, 263 F.3d 1135, 1141 (10th Cir. 2001) (admitting the statement that " 'He is going to kill me' " as an excited utterance despite the "non-factual character" of the statement). Here, the statement "I think he raped me" related to the startling event—discovery of the bruises—by explaining SrA HS's belief about how she got the bruises. Although the military judge's ruling contains very little in the way of findings of facts or legal analysis, in light of the evidence supporting his ruling the AFCCA properly held that the military judge did not abuse his discretion in admitting the exhibit and therefore did not plainly err in admitting SrA HS's testimony about the Snapchat message as well.

## B. Legal Sufficiency

### 1. *Applicable Law*

This Court reviews questions of legal sufficiency de novo. *United States v. Robinson*, 77 M.J. 294, 297 (C.A.A.F. 2018). " 'The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Id.* at 297-98 (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). In reviewing legal sufficiency, this Court "draw[s] every reasonable inference from the evidence of record in favor of the prosecution." *Id.* at 298 (alteration in original) (internal quotation marks omitted) (citation omitted). "As such, '[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction.' " *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (quoting *United States v. Navrestad*, 66 M.J. 262, 269 (C.A.A.F. 2008) (Effron, C.J., joined by Stucky, J., dissenting)).

As instructed by the military judge, to obtain a conviction in this case, the Government was required to prove beyond a reasonable doubt:

> (1) That at or near Charlotte, North Carolina, on or about 16 November 2018, [Appellant] committed a sexual act upon [SrA HS], by causing penetration, however slight, of [SrA HS]'s vulva by [Appellant]'s tongue;

> (2) That [Appellant] did so when [SrA HS] was incapable of consenting to the sexual act due to impairment by alcohol;

> (3) That [Appellant] knew or reasonably should have known [SrA HS] was incapable of consenting to the sexual act due to impairment by alcohol; and

> (4) That [Appellant] did so with an intent to gratify his sexual desire.

*See Manual for Courts-Martial, United States*, pt. IV, para. 45.b(4)(f) (2016 ed.) (*MCM*).

"The term 'consent' means a freely given agreement to the conduct at issue by a competent person." *MCM* pt. IV, para. 45.a.(g)(8)(A) (2016 ed.). "A sleeping, unconscious, or incompetent person cannot consent." *MCM* pt. IV, para. 45.a.(g)(8)(B) (2016 ed.). "Incapable of consenting" means lacking the cognitive ability to appreciate the sexual conduct in question or lacking the mental or physical ability to make or communicate a decision about whether the alleged victim agrees to the conduct. *United States v. Pease*, 75 M.J. 180, 185 (C.A.A.F. 2016) (citation omitted) (internal quotation marks omitted).

### 2. *Analysis*

Appellant contends the evidence was legally insufficient to prove beyond a reasonable doubt the second and third elements of the charged sexual assault: that SrA HS was incapable of consenting and that Appellant knew or reasonably should have known she could not consent. In Appellant's view, the evidence demonstrated that SrA HS could consent, did consent, and Appellant reasonably believed she consented.

We conclude that the evidence was legally sufficient to establish that SrA HS was incapable of consenting and that Appellant knew or reasonably should have known she was incapable of consenting. First, SrA HS testified that she felt dizzy and drunk when she was in the merchandise area after the opening band finished playing; she had consumed at least three strong mixed drinks without eating anything at the concert venue. She had no memory of what transpired after that point, except for falling into bed at the hotel fully clothed, until she awoke to find Appellant's arm draped around her unclothed body.

Second, Appellant's statements to SrA HS and to AFOSI filled in many of the gaps in SrA HS's recollection and supported a finding that he knew or reasonably should have known she was incapable of consenting due to intoxication. He did not know how many drinks she consumed, but he described her demeanor at the concert venue as the most intoxicated he had ever seen her, literally falling over and slurring her speech and causing her to be kicked out of the venue for being drunk. He described how she was too drunk to unlock her phone to find the address for their hotel, and she had to be helped into the hotel by Appellant and the taxi driver, where she stumbled around the room mumbling and urinated on both beds. And although Appellant told AFOSI that SrA HS was an active, willing participant in the sexual activity, grinding on him and making out with him until he pulled away, he also admitted that he knew it was wrong to engage in sexual activity with her because she was drunk.[4]

---

[4] Intoxication, standing alone, does not indicate one is sufficiently impaired to be incapable of consenting to sexual activity. *See United States v. Bodoh*, 78 M.J. 231, 237 (C.A.A.F. 2019) (noting that it is a "false premise that a person who is intoxicated is inherently incapable of consenting to sexual acts"); *United States v. Rogers*, 75 M.J. 270, 274 (C.A.A.F. 2016) (correcting the erroneous "belief that if someone was too drunk to remember that they had sex, then they were too drunk to consent to having sex"). However, as we note in the following paragraph, the members as the triers of fact were entitled to give weight to

The panel was obligated to determine how much weight to give to the evidence in this case in deciding whether SrA HS was too intoxicated to consent and whether Appellant knew or reasonably should have known that she was too intoxicated to consent. A reasonable panel could have given greater weight to evidence concerning the extent of her intoxication than to Appellant's self-serving statements to AFOSI about her active, willing participation in the conduct at issue.

Viewing this evidence in the light most favorable to the prosecution under the low threshold for sustaining a conviction on the issue of legal sufficiency, the Government presented sufficient evidence to establish that SrA HS was incapable of consenting to the charged sexual act due to her impairment by intoxication and that Appellant knew or reasonably should have known that she was incapable of consenting. Therefore, Appellant's conviction for sexual assault is legally sufficient.

Finally, Appellant argues that the AFCCA erroneously found the defense of mistake of fact as to consent was not in issue because the third element of the charged sexual assault offense required the Government to prove that Appellant should have known SrA HS was incapable of consenting. At trial, the military judge found that the evidence raised the defense of mistake of fact as to consent and instructed the members accordingly. We conclude that the Government introduced sufficient evidence for a reasonable trier of fact to conclude that any such mistake of fact was not "reasonable under all the circumstances." Rule for Courts-Martial 916(j)(1). We therefore hold that Appellant's conviction was legally sufficient and need not address whether the AFCCA erred.

---

Appellant's statements. The members could have reasonably viewed Appellant's statement as relevant evidence on the key issue of whether Appellant knew or reasonably should have known that SrA HS was intoxicated to the point of being incapable of consenting. *See Pease*, 75 M.J. at 185.

## III. Conclusion

We answer the assigned issues in the negative and affirm the decision of the United States Air Force Court of Criminal Appeals.